**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

TRACY L. TISDOL,                   :
                                   :   Civil Action No. 05-3823 (JAP)
            Petitioner,            :
                                   :
            v.                     :   **OPINION**
                                   :
RONALD H. CATHEL, et al.,          :
                                   :
            Respondents.           :


**APPEARANCES:**

      TRACY L. TISDOL, Petitioner <u>Pro Se</u>
      # 290743/947657B
      New Jersey State Prison
      P.O. Box 861
      Trenton, New Jersey 08625

      CHRISTOPHER W. HSIEH, ESQ.
      Passaic County Prosecutor's Office
      401 Grand Street
      Paterson, New Jersey 07505
      Counsel for Respondents

**PISANO**, District Judge

    This matter is before the Court on Petitioner Tracy L. Tisdol's petition for habeas corpus relief under 28 U.S.C. § 2254.  For reasons discussed below, the petition for habeas corpus relief will be denied for lack of merit.

I.   <u>BACKGROUND</u>

A.   <u>Statement of Facts</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, <u>see</u> 28 U.S.C. § 2254(e)(1), will simply reproduce the Appellate Division's factual recitation, as set forth in its November 12, 1999 <u>per</u> <u>curiam</u> Opinion on petitioner's direct appeal from his conviction:

> Shortly after 10 p.m. on July 13, 1995 Julissa Vargas, age 21, returned to her home in Paterson from the second of her two jobs and received a message that her long-time friend, Cindy Villalba, age 20, had called.  Vargas immediately phoned Villalba, a student at Rutgers University who had been away since May on a study trip to Costa Rica.  Villalba invited her to her home, and Vargas immediately drove her 1986 Dodge Colt to the Villalba residence, also in Paterson.
>
> Upon her arrival, at 10:30 p.m., Vargas had some soda with the Villalba family and went upstairs with Villalba to her room to talk.  Shortly after 11:00 p.m., the pair decided that they wanted to smoke cigarettes and, out of respect to Villalba's parents who did not approve of smoking, told Villalba's mother, Anna, that they were going to go for a short drive. Vargas and Villalba drove to East 38th Street, a predominately residential road in Paterson off Route 20, and parked on the side of the road with the windows rolled down.  It was a warm evening, and Vargas's car had no air conditioning.
>
> While the two were discussing Villalba's trip, Vargas heard some people approaching the car from behind.  As she turned around to look, three men suddenly appeared, two on Vargas's side of the car and one on Villalba's side.  The men stood very close to the car, eliminating any possibility of escape.  Vargas recalled that one of the men was heavy, while the other two were much thinner.
>
> According to Vargas, the heavy-set man squatted down next to her and stated, "It's not your lucky day." He then pulled out a small gun which, although largely covered by his hand,

seemed to be dark grey or silver, held it next to Vargas's
head and demanded money.  However, Vargas and Villalba had
no money; neither had brought their purses.

After learning that the girls had no money, the heavy-set
man ordered Vargas out of the car.  Before she got out of
the car, she heard a loud noise and realized that the gun
had gone off close to her head, causing her ears to ring.
Once Vargas was outside the car, the heavy-set man ducked
his head inside, while the other man on her side told Vargas
not to move and held his arm out to restrain her.  When the
heavy-set man pulled his head out of the car, Vargas heard
him say, "We got to get out of here," and the three
immediately ran away.

Back in her car after the men were gone, Vargas heard
Villalba say, "Oh, my God," while gagging and gasping for
air.  Vargas turned and saw some blood at Villalba's side
and called out Villalba's name but got no response.  Vargas
immediately started the car and drove Villalba to the
emergency room at Barnert Hospital.

Dr. Anthony Catania recalled that an unconscious Villalba
was brought into the emergency room at 11:30 p.m., with a
bullet wound in the left chest.  After determining Villalba
had no discernible pulse, Catania was forced to pronounce
Villalba dead at 12:15 a.m. and break the news to her
waiting parents.

An autopsy was performed on July 14, 1995 by Dr. Yury Kogan
of the Regional Medical Examiner's Office.  Kogan determined
that, upon entry, the bullet had traveled downwards, from
left to right, passing through Vargas's chest muscles, left
lung, heart, and diaphragm, and into her liver where it was
found embedded in a blood clot.  Kogan concluded that
[Villalba's] death had resulted from a penetrating gunshot
wound to the chest, which had perforated her heart, lung and
liver, resulting in massive internal bleeding and consequent
loss of oxygen to the brain.

Officer Kevin Kaufman of Paterson Police Department
responded to Barnert Hospital where he spoke with Vargas who
was extremely upset.  Vargas recounted what had happened and
described the three perpetrators.  Kaufman sent this
information over the radio so that a search for the
perpetrators could begin.

Detective Michael Finer of the Paterson Police Department also responded to Barnert Hospital and spoke with Vargas who repeated her account of the evening's events.  Finer instructed an officer to watch Vargas's car, which was still outside the emergency room entrance, until it could be towed to the city impound yard.  He then went with Vargas to the scene of the shooting in an unsuccessful effort to locate any evidence.

Detective Michael McNamara of the Paterson Police Department interviewed Vargas hours later at the police station.  In response to McNamara's questions, Vargas described the heavy-set man as taller than she, with a somewhat yellow complexion.  McNamara asked Vargas to review eight books containing about 400 photos each to see if she could identify anyone involved.  Although Vargas eventually selected three photographs, she was unable to make a positive identification.

Detective William Nativo of the Passaic County Sheriff's Department, processed Vargas's car at the Paterson Police Motor Pool with the assistance of two other officers during the early morning hours of July 14, 1995.  The officers discovered seven latent fingerprints which were lifted from the driver's side back window, the passenger side door and both the driver's and passenger sides of the roof.  They also found a .25 caliber shell casing on the floor behind the passenger seat during a subsequent examination of the interior of the car.

Nativo submitted the prints to the Bureau of Criminal Identification where they were photographed and then forwarded to the State Police Barracks in Totowa.  Once at the barracks, the photos were run through the Automated Fingerprint Identification System (AFIS) which identified a print lifted from the rear side window on the driver's side as belonging to defendant Meshach Greene.

When Finer received word that the AFIS had identified one of the fingerprints removed from the vehicle, he prepared a photo lineup containing Greene's photo, as well as the photos of several other African-American (black) men in their late teens to early twenties.  He showed this photo lineup to Vargas, who subsequently identified Greene as one of the three men involved in the shooting.  Notably, Finer and Investigator James Wood of the Passaic County Prosecutor's Office recalled that when she identified Greene's photo, Vargas indicated that this was the person

who shot her friend.  However, at trial Vargas testified that, at the time, she had only been certain that Greene was one of the three men involved.  She conceded, though, that she might have said that he was <u>possibly</u> the shooter. Nonetheless, Vargas was certain at trial that, based upon her recollection of the shooter as a very large man, he could not have been either Greene or Tisdol.

Warrants were prepared for both Greene's arrest and a search of his home, and Finer and McNamara attempted unsuccessfully to locate Greene on the streets.  At about 5 a.m. on July 15, 1995 Finer and McNamara proceeded to Greene's residence, knocked on the door, and were admitted by an elderly woman. They discovered Greene and his friend Corie Miller sleeping on the living room floor.  McNamara immediately arrested Greene and Detective George Jadlos of the Paterson Police Department took both Greene and Miller back to the station. The remaining officers then searched Greene's home, but failed to locate the murder weapon or any ammunition.

At the station, Finer interviewed Miller in a back room away from Greene, who was denying all involvement in the shooting and robbery.  Finer explained to Miller why Greene had been arrested and asked him to inform Greene about the fingerprint match and advise him to tell the police the truth.  Miller complied with this request and was then released by the police.

Finer then spoke with Greene who eventually admitted his involvement in the shooting of Villalba.  He told the police that on the night of July 13, 1995 he and Miller decided to do a "stick-up."  He recalled that they walked up to the driver's side of a parked car on 38th Street in Paterson and that Miller pulled out his gun, a chrome .25 caliber which Greene had seen him with on several earlier occasions, and demanded money from the two women inside.  Greene related that, upon learning that the two women had no money, Miller stated, "Fuck this," cocked the gun back, and struck the driver in the head, causing the gun to go off.  Greene claimed that he immediately said to Miller, "What the fuck are you doing?" and that Miller then ordered the driver out of the car and asked the passenger if she had been shot. Both men then ran away separately.

In his statement, Greene acknowledged that he stood by the driver after she was out of the car and told her not to move.  He also confirmed that he had his T-shirt pulled over his head at the time and that he touched the car.  In

addition, he told police that he spoke to Miller the next day and told him that it was stupid of him to have cocked the gun.  According to Greene, Miller stated that he cocked the gun to scare the women.

Based upon Greene's statement, Miller was soon arrested.  As the investigation progressed, the police identified Tracy Tisdol, a friend of Miller and Greene, as the third man involved in the shooting and robbery.  Investigator James Wood of the Passaic County Prosecutor's Office met with Tisdol at the Bergen County Jail on July 15, 1995 and obtained a formal statement from him regarding the events of July 13, 1995.  In this statement, Tisdol admitted that he was with Miller on the evening of July 13, 1995 and that they intended to rob someone.  He related that he spotted the car containing Villalba and Vargas and suggested to Miller that there "was somebody good" that they "could get."

Tisdol stated that he walked up to the passenger side of the car, while Miller approached the driver's side.  According to Tisdol, Miller pulled out his nickel-plated .25 caliber semiautomatic, a gun which Tisdol had seen on earlier occasions including that evening in the hands of Miller, cocked it and demanded money.  Tisdol related that, after informing Miller that they had no money, the girl on the passenger side started screaming.  Tisdol stated that Miller hit the driver on the head with the gun and it went off, hitting the passenger.  Tisdol recalled that Miller then ordered the driver out of the car and asked the passenger if she was all right.  Tisdol claimed that when the passenger did not reply, he ran away.

According to Tisdol, shortly thereafter, he called his friend Dana Anderson and told him what had happened.  He and Miller then went over to Anderson's house and discussed the incident with Anderson, his girlfriend, Jocelyn Johnson, and his cousin, Dontae Edmond.  He claimed that he told Miller how stupid he was to have used the gun.  Tisdol also stated that he and Miller stayed at Anderson's house for the night and that in the morning Miller seemed proud that he had killed someone, acting as though he "was bad" and had "a body on his jacket."  In his statement, Tisdol, when asked who was holding the gun when it went off, replied, "From the time we left Dana's house, to the time we got to the scene, to the time we left that scene, Corie Miller had the gun."

The police spoke with Anderson later that same afternoon, and Anderson related to them that shortly before 11 p.m. on

the night of the shooting, he was in his basement apartment along with his girlfriend Johnson, his cousin Dontae Edmond, Miller, Greene and Tisdol.  Although Anderson denied any knowledge of the robbery and shooting in his statement to the police at that time, at trial he stated that he had overheard Miller discussing plans to commit a robbery with Greene and Tisdol just before the three left his house around 10:30 or 11 p.m.  According to Anderson, Miller had a small chrome gun with a black handle in his possession at the time, but Anderson could not say whether or not Greene or Tisdol were aware of that fact.

Anderson further claimed at trial that, about one hour or so later, Miller called from Greene's house and informed Anderson that he, Tisdol and Greene had attempted to rob two women and he had hit someone in the head and that the gun had gone off and that he was not sure whether the woman had been hit.  According to Anderson, Miller insisted on coming back to his house, and Tisdol and Greene arrived shortly thereafter.  Both Greene and Tisdol were upset at Miller for having used the gun and Tisdol asked him why he pulled it out.  At that time Miller repeated what he had said on the phone in front of both Johnson and Edmond.

Johnson confirmed that Anderson received a phone call on the night of July 14, 1995.  She recalled that, shortly after this, Miller showed up, followed almost immediately by Greene and Tisdol, and informed them that he, Tisdol and Greene had tried to rob two girls in a car and that he thought he had shot one of them.  Johnson stated that everyone was asking Miller why he pulled out the gun.  All three of them were scared.

The police also learned that Beverly Cameron, one of Miller's former next-door neighbors in Paterson, had seen Miller with a gun two weeks before the shooting.  She explained that Miller had briefly pulled the gun out of his pocket in the street in front of her house, and she had been able to see that it was small, black and shiny.

Jadlos later located the gun based upon information provided by Edmond.  No helpful fingerprints were found on the weapon.  However, Sergeant Joseph Kucich, a ballistics expert with the New Jersey State Police, examined the .25 caliber semi-automatic Lorcin pistol, as well as the discharged shell and bullet, and confirmed that the pistol was operable and that it had discharged the bullet and shell.  At trial, Kucich explained that a bullet had to be

loaded into the firing chamber by pulling back the top of the gun before the weapon could be fired.  He further noted that the pistol did not fall in the "hair-trigger" category because it took five pounds of pressure, rather than the requisite six ounces, to make the gun discharge.

On August 8, 1996 Nativo came across cards containing Miller's fingerprints, which had been secured on August 24, 1995, and saw that there might be a match with one of the latent prints lifted from the driver's side roof of Vargas's car.  He arranged to have the latent print and the cards sent to the FBI, where they were reviewed by John Massey, a fingerprint specialist.  Massey confirmed that one of Miller's prints matched the latent lift.

Greene declined to testify at trial.  Tisdol, however, testified that he went to Anderson's house on the evening of July 13, 1995 and subsequently spoke with Greene and Miller about committing a robbery.  Although he insisted that they intended to intimidate their victim by their presence alone (_i.e._, without a gun), he admitted that he saw Miller clean a gun around 9 p.m. and subsequently put it in his pocket.  During his trial testimony, Tisdol claimed that the gun belonged to Anderson and that various people would hold the gun on difference [sic] occasions.  Nonetheless, he maintained that he was surprised when Miller pulled out the gun during the confrontation with Villalba and Vargas because Miller had not told him he was going to bring it.  Tisdol stated that the three had not talked about weapons or intimidation tactics prior to the incident.  Tisdol acknowledged that Villalba began screaming just before Miller struck Vargas.  Although Tisdol insisted that the gun went off when Miller hit Vargas on the head, he admitted that he saw fit to back up a few steps away from Villalba just before the gun went off.

Based upon this evidence, the jury found defendants guilty of all crimes charged in the indictment.  In so doing, the jury declined to find defendants guilty of the lesser-included offenses of aggravated manslaughter, manslaughter and robbery.

(Ra 5-15).[1]

---

[1]   Respondents provided the state court record with their answer to the petition.  Aside from the transcripts of the proceedings, which are noted in fn 2 of this Opinion, the

B.  Procedural History

Petitioner, Tracey L. Tisdol ("Tisdol"), was indicted by a Passaic County Grand Jury in November 1995, along with co-defendant Meshach Greene, on charges of first degree murder, first degree felony murder, second degree conspiracy to commit armed robbery, first degree armed robbery, second degree possession of a weapon for an unlawful purpose, third degree aggravated assault, and third degree unlawful possession of a weapon.  Corie Miller also was charged under this indictment, but was tried separately and convicted.

Tisdol and Greene were tried together before a jury, from February 4, 1997 to February 11, 1997.  The trial judge granted defendants' motion for acquittal on the seventh count (third degree aggravated assault) at the close of the State's case during trial.  On February 13, 1997, the jury returned a verdict of guilty on all remaining charges.[2]

------------------------------

relevant record is designated as follows:

| Ra1-Ra47 | Appellate Division per curiam Opinion filed November 12, 1999. |
|---|---|
| Ra48-Ra54 | Appellate Division per curiam Opinion filed February 10, 2005. |

    [2]  Transcripts of the state court proceedings were provided by the State and are designated as follows:

```
1T  - Transcript of Miranda Hearing dated June 27, 1996
2T  - Transcript of jury voir dire dated February 3, 1997
3T  - Transcript of jury voir dire dated February 4, 1997
4T  - Trial transcript dated February 4, 1997
```

Tisdol appeared for sentencing before the trial judge on April 18, 1997.  The court imposed an aggregate sentence of life imprisonment plus twenty years with a forty-year period of parole ineligibility.

Tisdol filed a direct appeal on June 27, 1997.  The Superior Court of New Jersey, Appellate Division affirmed the conviction and sentence in an Opinion and Order filed on November 12, 1999.  The Supreme Court of New Jersey denied certification on March 21, 2000.

Thereafter, on May 22, 2000, Tisdol filed his first petition for post-conviction relief ("PCR") in state court.  A hearing on the PCR petition was held before the trial judge, the Honorable Randolph M. Subryan, J.S.C., on March 14, 2003.  Judge Subryan denied the petition by Order entered on March 31, 2003.

Tisdol appealed from denial of his PCR petition, and the Appellate Division affirmed the trial court's decision by an unpublished Opinion filed on February 10, 2005.  The New Jersey Supreme Court denied certification on May 3, 2005.

---

```
        5T   - Trial transcript dated February 5, 1997
        6T   - Trial transcript dated February 6, 1997
        7T   - Trial transcript dated February 7, 1997
        8T   - Trial transcript dated February 10, 1997
        9T   - Trial transcript dated February 11, 1997
       10T   - Trial transcript dated February 13, 1997
       11T   - Transcript of Sentence dated April 18, 1997
       12T   - Transcript of post-conviction relief proceedings
               dated March 14, 2003.
```

Tisdol timely filed this federal habeas petition on or about August 2, 2005.  Respondents filed their answer and provided the relevant state court record on February 14, 2006 and February 21, 2006, respectively.

II.  <u>STATEMENT OF CLAIMS</u>

In his habeas petition, Tisdol raises the following claims for habeas relief:

Ground One: Prosecutorial misconduct during trial and summation.

Ground Two:  The admission of co-defendant Greene's statement without further redacting references to "we" and "stick up" was error and violated petitioner's constitutional rights.

Ground Three:  The trial court's charge to the jury was inadequate and misleading, and violated petitioner's right to a fair and impartial trial.

Ground Four: Trial counsel rendered ineffective assistance of counsel in failing to request a more thorough voir dire of the jury.  Pretrial publicity "required" a more thorough jury voir dire.

Ground Five:  Petitioner was denied effective assistance of appellate counsel in violation of the Sixth Amendment.

Ground Six:  The cumulative effect of the errors alleged above deprived petitioner of his right to a fair trial and due process.

The State answered the petition asserting several affirmative defenses.  First, the State argues that Tisdol has failed to exhaust his available state court remedies.  Second, the State asserts that petitioner's claims of constitutional error are procedurally defaulted because the state PCR court barred review of these claims pursuant to New Jersey Court Rule 3:22-4,-5.  Finally, the State argues that petitioner's claims are without merit or do not state a cognizable federal claim involving a federal constitutional violation.

### III.   EXHAUSTION & PROCEDURAL DEFAULT DOCTRINES

A.  Exhaustion Requirement

The exhaustion and procedural default doctrines are often confused because they operate in tandem to protect the integrity and independence of state judicial systems.  First, pursuant to the exhaustion doctrine, a federal court shall not *grant* a writ of habeas corpus on behalf of an individual in custody pursuant to a state court judgment unless "the applicant has exhausted the remedies available in the state courts."  28 U.S.C. § 2254(b)(1).  In order to exhaust state court remedies, a habeas petitioner must show that he "fairly presented" his claims to the state courts by "invoking one complete round of the State's established appellate review process."  Carpenter v. Vaughn, 296 F.3d 138,

146 (3d Cir. 2002) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999)).[3]

If a habeas petitioner has not "fairly presented" his claims to the state courts and it is still possible for him to raise those claims in a state court proceeding, the claim is unexhausted.  See, e.g., 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."); Carpenter, 296 F.3d at 146 (stating that a habeas claim is unexhausted where petitioner has not fairly presented the claim in state court and it remains possible for him to do so).  If the state law clearly forecloses review of a claim which has not been fairly presented to the state courts, a federal court entertaining a habeas petition will hear the claim despite petitioner's failure to fairly present the claim in state court, unless the claim is procedurally defaulted.  See 28 U.S.C. § 2254(b)(1)(B)(I); Carpenter, 296 F.3d at 146.

---

[3]  In Carpenter, the court applied the pre-AEDPA version of § 2254 because Carpenter filed his habeas petition before AEDPA went into effect.  Carpenter, 296 F.3d at 149 n.12.  This does not affect the court's thorough discussion of the exhaustion and procedural default doctrines as they relate to this matter.

In this case, based on review of the state court record, this Court finds that Tisdol has satisfied the exhaustion requirement, as his habeas claims were in fact the claims he pursued on direct review and in post-conviction proceedings. However, even if the habeas claims were not exhausted, this Court observes that, pursuant to 28 U.S.C. § 2254(b)(2), it has the authority to deny the habeas petition on the merits even if petitioner failed to exhaust the remedies available to him in state court.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); see also Duncan v. Walker, 533 U.S. 167, 203 n.6 (2001)(noting that under § 2254(b)(2), a district court may deny non-exhausted, non-meritorious claims); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003)(same).

B.  Procedural Default

     A procedural default occurs when a habeas petitioner's federal claim is "barred from consideration in the state courts by an 'independent and adequate' state procedural rule."  See, e.g., Carpenter, 296 F.3d at 146; Doctor v. Walters, 96 F.3d 675, 683 (3d Cir. 1996).  On habeas review of state prisoner claims, a federal court "will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to

be interwoven with the federal law, and when the adequacy and
independence of any possible state law ground is not clear from
the face of the opinion.'"  Coleman v. Thompson, 501 U.S. 722,
734-35 (1991)(quoting Michigan v. Long, 463 U.S. 1032, 1040-41
(1983)); see also Harris v. Reed, 489 U.S. 255, 266 (1989)
(holding that habeas claim was not procedurally defaulted where
state court did not clearly and expressly rely on procedural bar
as ground for rejecting the claim).[4]  Only a "firmly established
and regularly followed state practice" is adequate to prevent
subsequent habeas review in federal court.  James v. Kentucky,
466 U.S. 341, 348-351 (1984).  See also Lee v. Kemna, 534 U.S.
362, 376 (2002) ("Ordinarily, violation of 'firmly established
and regularly followed' state rules ... will be adequate to
foreclose review of a federal claim." (citations omitted)).
Generally speaking, "[a] state court's refusal to address a
prisoner's federal claims because he has not met a state
procedural requirement is both independent and adequate."
Cabrera v. Barbo, 175 F.3d 307, 312 (3d Cir. 1999) (citations
omitted).

     Finally, if it is determined that a claim is procedurally
defaulted, a federal court may only entertain such claim on

---

     [4] A state court's reliance on a procedural bar as an
alternate holding is sufficient to trigger the "cause" and
"prejudice" test.  See United States ex rel. Caruso v. Zelinsky,
689 F.2d 435, 440 (3d Cir. 1982).

habeas review if the petitioner shows either cause to excuse the default and prejudice resulting from the default or that a fundamental miscarriage of justice will result should the federal court fail to hear petitioner's claim.  See, e.g., Coleman, 501 U.S. at 750.

The "cause" standard requires a petitioner to show that some objective factor external to the defense impeded his efforts to comply with the state procedural rule.  See Coleman, 501 U.S. at 752 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).  In the absence of a Sixth Amendment violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation.  Coleman, 501 U.S. at 754.  Neither a pro se prisoner's ignorance of the procedural rule nor inadvertence satisfies the cause standard.  Murray at 485-87.  Failure of the state court to "bend the rules" for a pro se litigant is not cause.  Caswell v. Ryan, 953 F.2d 853, 862 (3d Cir. 1992).

To establish "prejudice," a petitioner must prove "'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension.'"  Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  In the context of an ineffective assistance claim, the Court of Appeals for the Third Circuit has held that prejudice

16

occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996).

In the alternative, in order to establish that failure to review an otherwise procedurally defaulted claim will result in a "miscarriage of justice," a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 496. "Thus, to establish a miscarriage of justice, the petitioner must prove that it is more likely than not that no reasonable juror would have convicted him." Werts, 228 F.3d at 193 (citing Schlup v. Delo, 513 U.S. 298, 326 (1995)).

Here, the Court finds that the claims raised in Tisdol's state PCR proceedings are not procedurally barred, as asserted by the State.  It is clear from the state court PCR proceedings that the trial judge did not rely solely on the application of the state procedural bars under N.J. Court R. 3:22-4 when the court denied the PCR petition.  Indeed, the PCR court discussed at length the merits of Tisdol's ineffective assistance of counsel claims and the alleged inadequacy of the jury voir dire, and found that petitioner did not show a federal constitutional violation.  Moreover, the Appellate Division affirmed the state PCR court's decision to deny relief on the merits and did not

17

rely solely on a procedural bar.  Therefore, this Court finds that the claims at issue are not procedurally defaulted and the Court may adjudicate those claims on habeas review.

IV.  <u>STANDARD OF REVIEW</u>

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).  Because petitioner is a <u>pro</u> <u>se</u> litigant, the Court will accord his petition the liberal construction intended for <u>pro</u> <u>se</u> petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  <u>See</u> 28 U.S.C. § 2254(e); <u>Duncan v. Morton</u>, 256 F.3d 189, 196 (3d Cir.), <u>cert</u>. <u>denied</u>, 122 S.Ct. 269 (2001); <u>Dickerson v. Vaughn</u>, 90 F.3d 87, 90 (3d Cir. 1996)(<i>citing</i> <u>Parke v. Raley</u>, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

18

    (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

        (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

        (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

    In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court explained that subsection (d)(1) involves two clauses or conditions, one of which must be satisfied before a writ may issue.  The first clause, or condition, is referred to as the "contrary to" clause.  The second condition is the "unreasonable application" clause.  <u>Williams</u>, 529 U.S. at 412-13.  In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Id</u>.  Under the "unreasonable application" clause, a federal court may grant the

writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case." Id. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  Id. at 411.  See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891.  If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  Werts, 228 F.3d at 197.

20

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result.  Id.  AEDPA prohibits such de novo review. Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable.  Id.  In short, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state

21

court." Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit
has ruled that this presumption of correctness based upon state
court factual findings can only be overcome by clear and
convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28
U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must
clear a high hurdle before a federal court will set aside any of
the state court's factual findings." Mastracchio v. Vose, 274
F.3d 590, 597-98 (1st Cir. 2001).

V.  ANALYSIS

The Court will examine each of petitioner's claims on the
merits, pursuant to the standard of review as recited above.

A.  Prosecutorial Misconduct

In his first ground for habeas relief, Tisdol asserts that
prosecutorial misconduct during the trial and in summation
deprived him of due process and a fair trial in violation of the
Fifth, Sixth, and Fourteenth Amendments.  In particular, Tisdol
states that the prosecutor persisted in asking leading questions
of certain witnesses relative to the central issue in the case,
namely, as to Tisdol's alleged lack of knowledge that co-
defendant Miller had a gun for the purpose of committing a
robbery.  (Pet., ¶ 12A).  Further, the prosecutor made remarks
during summation disparaging the character and defense of
petitioner and substantially prejudicing Tisdol's right to have

22

the jury fairly adjudicate the merits of his defense.  (Pet., ¶ 12A).  These claims of prosecutorial misconduct were raised on direct appeal.

　　1.  *Impermissible Leading Questions*

　　On the third day of trial, February 6, 1997, the prosecutor examined witness, Jocelyn Johnson, regarding her recollection of what the defendants said in Johnson's boyfriend's apartment after the robbery and shooting.  Johnson testified that both Tisdol and co-defendant Greene had told Miller that he was "stupid" for pulling out the gun and shooting the girl.  The prosecutor then asked Johnson whether she heard either defendant "say to Corie Miller I didn't know you had a gun."  Defense counsel immediately objected and the trial judge sustained.  However, Johnson had already answered the question in the negative.  (Ra 19).

　　The next day, Vargas testified that she did not hear either of the co-defendants make any comments after Miller pulled out the gun.  She also testified that Tisdol, the man who was on the passenger side of the car, did not say anything during the incident.  At the end of her direct testimony, Vargas remembered that Greene had said something, but she did not hear what he said.  At that point, the prosecutor asked, "He never said Corie I don't believe you have a gun?".  Tisdol's counsel immediately objected, and the objection was sustained.  The trial judge instructed Vargas not to answer the question.  Tisdol's counsel

23

placed a formal objection on the record after the jury was adjourned for the day.  (Ra19-Ra20).

On direct appeal, Tisdol's counsel argued that the prosecutor's deliberate repetition of this improper leading question was substantially prejudicial to Tisdol and his primary defense that he was unaware that a gun was present and would be used during the robbery.  The Appellate Division rejected this ground for appeal, finding:

> Although the questions posed to Johnson and Vargas were undeniably improper due to their leading nature, we do not agree with defendants that they deprived defendants of a fair trial.  The fact that the trial judge sustained the defense objections to both questions and precluded Vargas from answering cannot be ignored.  In view of the fact that Vargas had already definitively testified that Tisdol made no statements after Miller drew out his weapon, we fail to see how the prosecutor's question could have severely prejudiced the case. ...  We reject this claim of reversible error.

(Ra21-Ra22).

Habeas review of a claim based on prosecutorial misconduct is limited to determining whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  If it does not infect the entire trial,

misconduct alone is not enough to warrant a new trial.  Id. at

220.  "A criminal conviction is not to be lightly overturned on

the basis of a prosecutor's comments [or conduct] standing alone,

for the statements or conduct must be viewed in context."  United

States v. Young, 470 U.S. 1, 11 (1985).

However, the U.S. Supreme Court has recognized the

obligation of a prosecutor to conduct a criminal prosecution with

propriety and fairness.

> He may prosecute with earnestness and vigor – indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as
> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.
> ...  Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).

"Supreme Court precedent counsels that the reviewing court

must examine the prosecutor's offensive actions in context and in

light of the entire trial, assessing the severity of the conduct,

the effect of the curative instructions, and the quantum of

evidence against the defendant."  Moore v. Morton, 255 F.3d 95,

107 (3d Cir. 2001).

This Court finds that the prosecutor's questions did not

have the capacity on their own to so infect the trial with

unfairness as to make the resulting conviction a denial of due

process.  Even accepting that the questions were improper, they
did not have a prejudicial impact on Tisdol, because Vargas
already had testified that Tisdol did not say anything during the
robbery.  Therefore, the Court finds no error of constitutional
dimension.  Further, the Appellate Division's ruling was not
contrary to, and did not involve an unreasonable application of,
clearly established federal law; nor was it based on an
unreasonable determination of the facts in light of Vargas'
testimony and the overwhelming evidence presented in the state
court proceedings.  Accordingly, this claim will be denied.

2.  *Prosecutor's Summation*

Next, Tisdol argues that the prosecutor made disparaging
remarks as to petitioner's character so as to inflame the jury
against him.  The pertinent sections of the summation are:

> ... [Defendants] didn't have much in this case because the
> evidence was overwhelming.  So what we have is a situation
> where the defendants are coming to you and trying to cut
> their losses.  ...  This is not Alice in Wonderland where
> the defendants tell you this is what I'm guilty of and
> that's it.

(9T 99:16-18; 100:6-8).

> ... Now, we heard that from Tracy Tisdol's testimony that
> this gun that was around that Corie Miller had often, that
> others have had access to.  And I want to get into that a
> little bit later on how you're going to judge people who are
> fooling around with guns, who were planning to commit
> robberies and ask yourself when the last time you went out
> with your buddies and your friends and said let's do a

26

robbery.   These are the people you're going to have to
judge.

(9T 108:23-109:5).

...   You are judging credibility, people, you are judging
people who have stepped outside the bounds of law and only
you can do that because you have lived your lives within
those bounds so you are the ones who know when someone has
stepped outside of them.   Judge three men who were planning
to rob someone.   Judge three men who were going to
intimidate someone to giving them money, who were going to
rough them up, if necessary, who had a gun.   That's who you
are judging.

Again this is not what you and your friends talk about.
These are people on the other side.   That's how you're able
to judge them.   That's how you know that they stepped
outside those boundaries because you know how you've
conducted your lives.

(9T 122:18-123:6).

At the close of the prosecutor's summation, defense counsel

made an objection to the "people on the other side".   The trial

judge found that the comments were not ideal, but they were not

so improper as to warrant a curative instruction.   Tisdol then

raised this claim on direct appeal.   The Appellate Division

ruled:

Contrary to defendants' contentions, we do not conclude that
the prosecutor's "cut their losses" or "Alice in Wonderland"
comments, when viewed in context, denigrated the defense in
any significant invidious way.   Rather, it appears to us
that these remarks were intended to respond to the approach
taken by the two defense attorneys in summation of
acknowledging each defendant's guilt of certain charges in
the hopes of persuading the jury to acquit on the remaining
charges.   Additionally, we agree with the trial judge that

the prosecutor's "people on the other side" comment was not
intended to incite the jury to condemn defendants as
despicable human beings, but rather to help them come to
terms with their assigned task of judging defendants'
conduct.  In any event, the comment in no way compares with
those made in the cases cited by defendants, none of which
was deemed on its own to constitute reversible error.  See
e.g., State v. Clausell, 121 N.J. 298, 341 (1990)(defendants
described by prosecutor as "maniacs"); State v. Pennington,
119 N.J. 547, 576-77 (1990)(prosecutor described defendant
in opening statement as a "jackal" and a "stranger to
humanity"); State v. Siciliano, 21 N.J. 249, 262
(1956)(prosecutor described defendant as a "butcher boy" in
summation); State v. Von Atzinger, 81 N.J. Super. 509, 516
(App. Div. 1963)(terms "hood," "punk," and "bum" used by
prosecutor in summation to describe defendant).  We cannot
ignore that defendants admitted to robbery and deviating
from the societal norm.  We disagree with defendants that
the prosecutor's remarks were "foul blows" and warrant a
reversal of their convictions.

(RA26-Ra27)(emphasis in original).

     When a prosecutor's opening or closing remarks are

challenged in a habeas petition, "[t]he relevant question is

whether the prosecutor's comments 'so infected the trial with

unfairness as to make the resulting conviction a denial of due

process.' " Darden v. Wainwright, 477 U.S. 168, 181 (1986)

(quoting Donnelly, 416 U.S. at 643).  In determining the likely

effect of improper comments, a court may consider whether the

comments were responsive to or invited by prior comments made by

opposing counsel.  Darden, 477 U.S. at 181-82.  Accordingly, in

analyzing whether a due process violation occurred, the court

must examine the prosecutor's comments "in context and in light

of the entire trial, assessing the severity of the conduct, the

28

effect of the curative instructions, and the quantum of evidence against the defendant."  <u>Moore</u>, 255 F.3d at 107.

In this matter, the prosecutor's comments did not "so infect the trial with unfairness" to constitute a denial of Tisdol's due process rights because the comments were responsive to the approach taken by defense counsel in summation, which acknowledged petitioner's guilt as to robbery in the hopes of gaining acquittal on the murder charges.  Moreover, the quantum of evidence against Tisdol was significant.

Therefore, Tisdol has not demonstrated that the determinations of the Appellate Division were contrary to or involved an unreasonable application of clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  Accordingly,  the Court finds that the prosecutor's allegedly improper comments in summation did not violate petitioner's due process rights.

B.   <u>Admission of Co-Defendant's Redacted Statement</u>

Next, petitioner claims that the trial judge allowed a redacted statement by co-defendant Greene to be admitted at trial, forcing Tisdol to take the stand.  Before trial, Greene's statement to the police was redacted to remove all references to Tisdol.  The redacted statement was then re-typed so that the

jury would be unaware of the changes.  However, Tisdol's attorney
requested that the statement be redacted further to remove all
references to "we" in the following response: "I was with my
friend Corie Miller and we wanted to do a stick up.  We were
walking up Route 20 and when we got to East 38th Street, we went
up to the car, me and Corie went to the driver's side."  Before
redaction, the response originally read: "I was with my friends
Corie Miller and Tracy Tisdol ... ."  Tisdol's attorney was
concerned that the jury would not infer that the "we" in the
statement referred only to Greene and Miller, but also to Tisdol.

The trial judge found that the statement as redacted was
fine:

> [i]f the other evidence shows that Mr. Tisdol was there and
> he went to the passenger side, that's coming from other
> witnesses in the case.  When I instruct the jury as to the
> purposes of a statement, I'm going to let them know that
> they can only use the statement against each defendant and
> one statement can't be used against the other defendant.
> That is the law and that's what I plan to tell the jury.

(Ra37).  After the judge's pre-trial ruling, Tisdol's counsel
alternatively argued that the sentence referencing a "stick up"
should be redacted because it would preclude Tisdol's defense
that he only agreed to an unarmed robbery.  Leaving the sentence
unredacted would force Tisdol to testify at trial so as to
establish this defense.  The prosecutor argued that an
appropriate instruction to the jury against attributing Greene's

"stick up" language to Tisdol would suffice.  The trial court

agreed.  Consequently, at trial, before Greene's redacted

statement was presented to the jury, the judge gave the following

instruction:

> The State is offering as part of its proof the testimony
> from Sergeant Michael Finer that Meshach Greene gave a
> written statement to the police.  The statement being
> presented for your consideration contains only information
> that pertains to the trial of Meshach Greene.

> Pursuant to Court rules certain information which does not
> pertain to this trial has been removed from the statement
> resulting in the version which is being presented in Court.
> All of the attorneys in this Court and this Court are aware
> of the changes to the statement.

> With regard to the statement of Meshach Greene, I instruct
> that you may consider only the information presented in
> Court; and I further instruct that you must not speculate as
> to the contents of information not presented and you must
> not speculate or consider in any manner as to the reason
> that the statement is being presented in this manner.  As I
> have indicated, certain information in the statement simply
> does not pertain to this trial.

> ...

> The alleged statement of Meshach Greene may only be
> considered by you during your evaluation of whether Meshach
> Greene is guilty or not guilty.  You shall not consider the
> statement of Meshach Greene in your evaluation of whether
> Tracy Tisdol is guilty or not guilty.

> Similarly, the alleged statement of Tracy Tisdol may only be
> considered during your evaluation of whether Tracy Tisdol is
> guilty or not guilty, and you shall not consider the
> statement of Tracy Tisdol in your evaluation of whether
> Meshach Greene is guilty or not guilty.

> In other words, the State may only use a defendant's
> statement against that defendant alleged to have made the
> statement.

(7T 44:21-46:9).  The court reiterated this instruction at the

conclusion of trial during the jury charge.  (9T 192:8-12).

On direct appeal, the Appellate Division rejected Tisdol's

constitutional claim:

> Because the admission of a non-testifying defendant's
> confession in a joint trial has the potentiality for
> prejudice to other defendants implicated by that confession,
> a trial court should, if possible, grant an implicated
> defendant's request to delete all incriminating references
> contained within the statement so as to avoid a
> confrontation clause violation. [Bruton v. United States,
> 391 U.S. 123 (1968); State v. Young, 46 N.J. 152 (1965)].
> In order for there to be "effective deletion," a trial court
> should take care to eliminate not only direct or indirect
> co-defendant identifications contained within the
> confession, but also any statements that could be damaging
> to a co-defendant once his identity is already established.
> Id. at 159.  Additionally, a trial court should avoid simply
> replacing a co-defendant's name with a blank space or the
> word "deleted." [Gray v. Maryland, 523 U.S. 185 (1998)].
> Notably, a limiting instruction will not usually suffice to
> eradicate the potential for prejudice to a non-confessing
> co-defendant resulting from the admission of an unredacted
> statement.  State v. Laboy, 270 N.J. Super. 296, 304-05
> (App. Div. 1994).

> Tisdol now insists that, in light of the testimony it had
> already heard from a number of witnesses placing him at the
> scene, the jury would "certainly assume" that the challenged
> portion of Greene's statement also referred to him.  We do
> not agree that any Confrontation Clause violation occurred.
> First, unlike the situation in Gray v. Maryland, the jury
> was not made aware of where the changes to Greene's
> statement had been made through the use of blank spaces or
> the word "deleted."  Additionally, the "we" to which
> defendant now objects can be logically understood as
> referring only to Miller and Greene based upon the contents
> of the preceding sentence and the fact that the statement as

a whole does not mention Tisdol at all.  In any event, even
if the jury could have attributed to Tisdol the intent to do
a "stick up" based upon Greene's statement, we cannot ignore
that the same inference could have been drawn based upon
Tisdol's own admissions to the police that he saw Miller
with a gun prior to the robbery-murder and then again at the
crime scene and from the testimony of the State's other
witnesses.  We reject defendant Tisdol's Confrontation
Clause contention.

(Ra39-Ra40).

The admissibility of evidence is generally a question of
state law which is not cognizable under habeas review.  See
Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir.), cert. denied,
534 U.S. 973 (2001); U.S. ex re. Hickey v. Jeffes, 571 F.2d 762,
766 (3d Cir. 1978).  However, the Sixth Amendment's Confrontation
Clause confers rights that cannot be satisfied merely by meeting
the requirements of the rules of evidence.  The Confrontation
Clause provides that, "[i]n all criminal prosecutions, the
accused shall enjoy the right ... to be confronted with the
witnesses against him."  This guarantee applies to both federal
and state prosecutions.  Pointer v. Texas, 380 U.S. 400 (1965).

In Bruton, the Supreme Court held that the admission at a
joint trial of a non-testifying co-defendant's confession which
also names defendant as a participant in the crime violates the
Confrontation Clause, even when the court gives a limiting
instruction.  But in Richardson v. Marsh, 481 U.S. 200, 208
(1987), the Supreme Court clarified that the co-defendant's

33

confession or statement must incriminate the defendant on its face to give rise to a <u>Bruton</u> violation.  Specifically, the <u>Richardson</u> Court held that the Confrontation Clause is not offended when the confession is redacted to eliminate any reference to defendant but the defendant is nonetheless linked to the confession by other evidence.

In this case, the trial court admitted co-defendant Greene's redacted statement removing all references to Tisdol.  The Appellate Division expressly found that the redacted statement did not incriminate Tisdol because, in the redacted form, the reference to "we" appeared to apply only to Greene and Miller. Further, the court concluded that attribution of Tisdol's intent to do a "stick up" could be inferred easily from other substantial evidence, including Tisdol's own admissions to the police and the testimony of other witnesses at trial.

Accordingly, this Court finds that the Appellate Division's adjudication of the Confrontation Clause claims regarding admission of Greene's redacted statement was not contrary to or an unreasonable application of <u>Bruton</u> and its progeny because the challenged statements did not on the face incriminate Tisdol as a participant in the crime.[5]  See <u>Priester v. Vaughn</u>, 382 F.3d 394,

---

[5] The Supreme Court held in 2004 that the Confrontation Clause bars the admission of nontestimonial hearsay which incriminates the defendant unless the declarant is unavailable and defendant had a prior opportunity for cross examination.

400 (3d Cir. 2004) (distinguishing out-of-court statements that
directly incriminate the petitioner and those which do not
facially incriminate the petitioner but may do so only when
linked with evidence introduced later at trial), <u>cert</u>. <u>denied</u>,
543 U.S. 1093 (2005); <u>U.S. ex rel. Cole v. Lane</u>, 752 F.2d 1210,
1216 (7th Cir.1985) (statement "did not necessarily implicate"
accused); <u>United States v. Jenkins</u>, 785 F.2d 1387, 1393 (9th
Cir.1986) (statement did not "directly implicate" accused).
Therefore, Tisdol is not entitled to habeas relief on this
ground.

---

<u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004).  Even if <u>Crawford</u>
governed, which it does not because it was not clearly
established until 2004, it would not affect the outcome here
because the challenged statement did not directly implicate
Tisdol in the crime.
　　　Moreover, even if <u>Crawford</u> did apply, a violation of the
Confrontation Clause is subject to harmless error review.  <u>See</u>,
<u>e.g.</u>, <u>Crawford</u>, 541 U.S. at 76 (Rehnquist, C.J., concurring in
the judgment) ("to the Court's credit is its implicit recognition
that the mistaken application of its new rule by courts which
guess wrong as to the scope of the rule is subject to harmless-
error analysis"); <u>United States v. Hinton</u>, 423 F.3d 355, 362-63
(3d Cir. 2005).  Here, the evidence against Tisdol was
substantial, consisting of Tisdol's own statements to police and
the testimony of other witnesses at trial.  Thus, assuming that
admission of the redacted statement might be determined a
violation of the Confrontation Clause, the error was clearly
harmless.
　　　This Court also finds that there was no violation of
Tisdol's due process rights in this regard because the trial
court provided curative instructions to the jury, namely, that
Greene's statement was to be considered only as to whether Greene
was guilty or not guilty and could not be used to determine
whether Tisdol was guilty or not guilty.

C.   <u>Trial Court's Jury Charge</u>

In ¶ 12B of his petition, Tisdol generally asserts that the trial court's jury charge was inadequate and misleading, violating his right to a fair and impartial trial.  Tisdol does not provide any underlying facts or legal support for this claim, although in his petition, he appears to refer to the issue regarding admission of the redacted statement.  For the reasons explained in the preceding section of this Opinion, the Court finds that Tisdol is not entitled to habeas relief on this ground.

To the extent that Tisdol may be attempting to raise the same arguments asserted in his state PCR petition regarding certain alleged inadequacies in the jury charge, the Court also finds no basis for relief.

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the

36

Constitution.  And we also bear in mind our previous
admonition that we "have defined the category of
infractions that violate 'fundamental fairness' very
narrowly."  "Beyond the specific guarantees enumerated
in the Bill of Rights, the Due Process Clause has
limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re

Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

Where such a constitutional error has occurred, it is

subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at

416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).  "[I]f

the [federal habeas] court concludes from the record that the

error had a 'substantial and injurious effect or influence' on

the verdict, or if it is in 'grave doubt' whether that is so, the

error cannot be deemed harmless."  Id. at 418 (citing California

v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged

instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge.  If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

Middleton v. McNeil, 124 S.Ct. 1830, 1832 (2004) (internal

quotations and citations omitted).

Here, the state PCR judge addressed each of Tisdol's seven

claims challenging the jury instructions[6] and rejected them as a

whole, finding the jury charge to be proper and in conformity

---

        [6]  In his PCR proceedings, Tisdol asserted that the jury
charge was deficient because (1) the charge did not explicitly
state that an accomplice and principal may be guilty of differing
degrees of criminality; (2) the charge on permissive inference of
intent to cause serious bodily harm/death from use of a deadly
weapon did not address alternative scenarios that would negate
the inference; (3) the charges on the lesser offense of
aggravated manslaughter and reckless manslaughter were
insufficiently indistinguishable from each other; (4) the court
did not reiterate an appropriate modified charge on accomplice
liability for each substantive charge; (5) the court did not give
an illustrative example of the type of scenario which might
trigger the affirmative defense to felony murder; (6) the charge
did not state that only a purposeful state of mind could
establish accomplice liability for murder pursuant to 2C:11-3(a)
or (b); and (7) the charge did not sufficiently relate the facts
of the case to the substantive offenses on accomplice liability.
(12T 39:16-40:16).

with governing state law.[7]  On appeal from denial of the PCR

petition, the Appellate Division affirmed the PCR court, finding:

> Similarly, our review of the charge as a whole reveals
> instructions that appropriately and correctly focused the
> jury's attention separately on each defendant's culpability.
> The jury was told that they must consider each accomplice's
> liability separately, based upon that participant's state of
> mind, and that "to convict the defendants as accomplices to
> the specific crimes charged, you must find that the
> defendants had the purpose to participate in that particular
> crime."

(Ra52).

Further, several claims challenging other aspects of the

jury instructions were raised on direct appeal, and found to be

without merit.  (Ra30-Ra33; Ra40-Ra43).

This Court is bound by the state court decisions concluding

that there was no error of state law in the challenged

---

[7]  In rejecting the claims, the PCR judge made explicit
reference to the trial transcript covering the jury charge and
concluded (1) that the court gave explicit instructions that an
accomplice and principal may be found guilty of differing degrees
of criminality and that only a purposeful state of mind can
establish liability; (2) that the court addressed the issue of
permissive inferences and listed in detail the circumstances that
could be taken into account in determining an inference; (3) that
the court gave a detailed charge on the differences between the
lesser offense of aggravated manslaughter and reckless
manslaughter; (4) that the court reiterated that accomplice
liability had to be taken into account for each charge; and (5)
that the court gave a clear explanation of the affirmative
defense available to felony murder.  (12T 42:13-43:19).  The PCR
court concluded:
> In short, the jury instructions were not narrowly focused
> but told the measure of all defendants' relevant conduct on
> the night of shooting.  The court's instructions clearly
> spelled out for the jury how to apply the law to the facts.
(12T 43:20-24).

instructions.  As the instructions conformed to state law, they did not operate to deprive Tisdol of a fair trial, and he is not entitled to relief on this claim.  Moreover, Tisdol has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the trial court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

D.   Inadequate Jury Voir Dire

     In his next ground for relief, Tisdol asserts a two-part claim: he argues that the pretrial publicity surrounding this case "required" a more thorough jury voir dire, and that his trial counsel was ineffective, in violation of the Sixth Amendment, in failing to request a more thorough voir dire, thus resulting in unfair prejudice to petitioner at trial.  The Court will deal with these claims separately.

     These claims were raised for the first time on Tisdol's state PCR petition.[8]  The PCR court found that the trial judge

---

     [8]  Tisdol's PCR counsel admitted that the trial judge excused virtually every juror who had read about the case, an admirable gesture beyond the strict requirements of the law." (12T 31:24-32:2).

asked numerous questions of each prospective juror "sufficient for defense counsel to determine whether any jury panel member had prior knowledge of the incident or was prejudice[d] by pretrial publicity or any other attitudes about the core issues and themes of the case." (12T 33:2-6). Further, the PCR court noted that the trial judge excused virtually every juror who was familiar with the case. Consequently, the PCR court ruled that petitioner had "not demonstrated by a preponderance of the evidence that the voir dire of prospective jurors was insufficient and resulted in defendant's prejudice." (12T 33:9-13).

The Appellate Division affirmed the PCR court's ruling, finding that "Judge Subryan's voir dire of the jury convinces us that the inquiry was adequate to empanel an impartial jury that was capable of assessing the evidence without bias, sympathy, or prejudice." (Ra52).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. Amend. VI. The right to an impartial jury is applicable to the States through the Fourteenth Amendment. See Morgan v. Illinois, 504 U.S. 719, 726 (1992); Duncan v. Louisiana, 391 U.S. 145 (1968).

41

Thus, the Constitution requires an impartial jury, but it does not dictate a "catechism" for jury voir dire.  Morgan, 504 U.S. at 729.  Absent racial or ethnic bias, or capital punishment issues, the Supreme Court has held that trial courts have substantial discretion in determining the need for specific questions during jury voir dire.  See Rosales-Lopez v. United States, 451 U.S. 182, 190 (1981); Ristaino v. Ross, 424 U.S. 589, 595 (1976)(the Supreme Court acknowledged that constitutional requirements exist as to questioning prospective jurors about racial or ethnic bias).  Consequently, under federal law, the trial courts have considerable discretion in conducting voir dire; however, trial courts must make inquiries relevant to disclose actual bias and satisfy the demands of fairness.  See Butler v. City of Camden, 352 F.3d 811, 819 (3d Cir. 2003)(citing United States v. Dansker, 537 F.2d 40, 56 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977)).  Trial judges are afforded discretion in conducting voir dire because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." Ristaino, 424 U.S. at 594 (citation omitted).  A trial judge's factual findings during jury voir dire are entitled to a presumption of correctness on habeas review.  See Wainwright v. Witt, 469 U.S. 412, 428 (1985).

42

In this case, Tisdol complains that the trial judge did not conduct a proper or adequate voir dire of the jury.  However, Tisdol submits no evidence that his jury was impartial or unfair, or that any particular juror was biased.  A review of the record indicates that the trial court conducted a thorough and adequate voir dire, and excluded any juror who had knowledge or read about the case, thereby removing the potential for bias from any pretrial publicity.  There were no issues of race raised, nor was the death penalty sought in this case.  The trial judge asked specific and pertinent follow-up questions of individual jurors who responded affirmatively to his general questions probing bias.  Defense counsel neither requested specific questions on voir dire, nor did he object to the court's general voir dire of the jury.  Counsel displayed no dissatisfaction with the jury impaneled.

Therefore, this Court concludes, based on the record and Tisdol's lack of evidence as to jury bias, that Tisdol has not shown, as required by 28 U.S.C. § 2254(d), that the state court action "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  Accordingly, this ground for a writ
of habeas corpus will be denied.

E.   Ineffective Assistance of Trial Counsel

As noted above, Tisdol complains that his trial counsel was
ineffective for failing to request the court to voir dire the
jury on issues of potential racial bias based on the interracial
nature of the crime (defendants were black and the victims were
Hispanic), and on the impact of pretrial publicity.  Tisdol
raised this claim in his PCR proceedings.  The PCR court rejected
the claim, noting that ineffective assistance of counsel claims
based on a faulty jury voir dire are typically denied as
strategic choices of counsel that must be given deference without
evidence to the contrary, such as certification from trial
counsel that it was not a tactical decision.  (12T 36:3-20).  The
Appellate Division affirmed the PCR court's ruling on appeal.
(Ra50-Ra51).  This Court also notes that the state courts found
that the trial court was plainly cognizant of the issue of
pretrial publicity and excused every juror who had read about the
case.  (See Section IV.D. of this Opinion, supra).

The "clearly established Federal law, as determined by the
Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is
the standard for ineffective assistance of counsel as enunciated
in Strickland v. Washington, 466 U.S. 668 (1984).  Under
Strickland, a petitioner seeking to prove a Sixth Amendment

44

violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  <u>Id</u>. at 688-89; <u>Jacobs v. Horn</u>, 395 F.3d 92, 102 (3d Cir. 2005); <u>Keller v. Larkins</u>, 251 F.3d 408, 418 (3d Cir.), <u>cert</u>. <u>denied</u>, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." <u>Id.</u>  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

<u>Id.</u> at 689 (citations omitted); <u>see</u> <u>also</u> <u>Virgin Islands v. Wheatherwax</u>, 77 F.3d 1425, 1431 (3d Cir.), <u>cert.</u> <u>denied</u>, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, petitioner must also show that counsel's substandard performance actually prejudiced his defense.  Strickland, 466 U.S. at 687. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. Id. at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  Id. at 697.  See also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

In this case, the Court finds that petitioner has not demonstrated deficient performance by trial counsel.  The issue of pretrial publicity was adequately handled by the trial judge. Moreover, Tisdol has not demonstrated that counsel's alleged failure to request a more thorough voir dire on racial bias was not a strategic decision.  He also fails to show that any juror was racially biased or prejudiced against the defendants.

Moreover, even if this Court were to assume arguendo that the trial counsel's failure to request a more thorough voir dire constituted deficient performance, this habeas claim still fails because Tisdol cannot prove the prejudice prong under Strickland.

There is no showing that this error by trial counsel was so serious as to deprive Tisdol of a fair trial or that a different outcome would have resulted at trial otherwise.  There was overwhelming evidence of Tisdol's guilt, as well as Tisdol's own admission that he participated in the robbery.  Therefore, Tisdol has not shown that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  Nor was the state court rulings contrary to established federal law set forth in Strickland.  Therefore, this claim will be denied.

F.   Ineffectiveness of Appellate Counsel

Tisdol also argues that his appellate counsel was constitutionally deficient in his representation of petitioner on direct appeal.

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); Wright v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004).  Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may

47

establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Moreover, in order to prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal. See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert. dismissed, 527 U.S. 1050 (1999).

Here, Tisdol raised this claim in his state PCR proceedings, and the PCR court found the claims to be without merit. (12T 36:21-37:15). On appeal from the PCR court's decision, the Appellate Division affirmed. (Ra50). Based on review of the record, this Court finds that petitioner fails to establish ineffective assistance of appellate counsel because he cannot show that a different outcome would have resulted on appeal if counsel had raised the arguments concerning the jury voir dire and trial counsel's performance in that regard on direct appeal. These claims were presented for state court review in petitioner's state PCR proceedings and found to be totally

48

lacking in merit.  Accordingly, Tisdol can not establish the prejudice prong under Strickland with respect to these claims.

Furthermore, as to Tisdol's claim alleging ineffective assistance of trial counsel, such claims are not typically raised on direct appeal because it requires the appellate court to look beyond the bounds of the record and the evidence presented at trial.  Therefore, this Court cannot conclude that the determination of the ineffective assistance of appellate counsel claim by the state courts resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact and this claim will be denied accordingly.

G.  Cumulative Errors Claim

Finally, Tisdol asserts that the cumulative effect of the alleged trial errors deprived him of his due process and his constitutional right to a fair and impartial trial.

Even if none of the claims on their own amounts to a constitutional violation, the "cumulative effect of the alleged errors may violate due process."  United States ex rel. Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980); see also Douglas v. Hendricks, 236 F. Supp.2d 412, 436 (D.N.J. 2002) (Walls, J.) (no cumulative error when the trial was fair and verdict supported by sufficient evidence); Pursell v. Horn, 187 F. Supp.2d 260, 374

(W.D. Pa. 2002) ("That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue.").[9]  In Marshall v. Hendricks, the Court of Appeals for the Third Circuit evaluated a cumulative error claim and found:

> Here, even were we to cumulate all the claimed errors and superimpose them over the extensive trial proceedings, given the quantity and quality of the totality of the evidence presented to the jury, we could not conclude that the New Jersey Supreme Court unreasonably applied Supreme Court precedent or unreasonably determined the facts in making its ruling.

See 307 F.3d 36, 94 (3d Cir. 2002), cert. denied, 538 U.S. 911 (2003).

This Court has determined that no errors occurred or that, to the extent errors did occur, they were harmless.  A review of the record reveals that any errors that may have occurred remain harmless when cumulated, and that the trial was fair and the verdict was supported by ample evidence.  As found in Marshall, supra, Tisdol has not demonstrated that the actions of the state courts "resulted in a decision that was contrary to, or involved

---

[9]  Neither the Supreme Court nor the Court of Appeals for the Third Circuit has established a standard by which a claim of cumulative error must be determined.  See Pursell, 187 F. Supp.2d at 374-76 (describing three alternative approaches).

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

## IV.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## **CONCLUSION**

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.  An appropriate Order follows.


/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge

Dated: September 25, 2006